**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF MISSISSIPPI**
**WESTERN DIVISION**

**ENTERGY MISSISSIPPI, INC.**                                                                **PLAINTIFF**

**VS.**                                                      **CIVIL ACTION NO. 5:11cv49-HTW-LRA**

**MARQUETTE TRANSPORTATION**
**COMPANY, LLC and**
**BLUEGRASS MARINE, LLC**                                                              **DEFENDANTS**

---

**BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

COMES NOW Plaintiff, Entergy Mississippi, Inc. ("Entergy"), by and through counsel, and submits this memorandum brief, along with exhibits, in support of the motion for partial summary judgment, and in support thereof would respectfully state and show unto this Honorable Court as follows, to-wit:

### I.  Introduction

On April 5, 2008, M/V Robert E. Frane, along with barges in tow, attempted to pass through the Vicksburg Railroad Bridge while heading south on the Mississippi River.  One of the barges in tow (port stern barge) allided with the easternmost pier of the Vicksburg Railroad Bridge and came loose from the tow of twenty five barges.  While efforts were being made to get the tow under control, one of the barges (port lead barge) struck Entergy's dock and fuel unloading facility at the Baxter Wilson Plant in Vicksburg, Mississippi.  This allision caused damage to the Dolphin Fender System, which is used to protect the mooring/breasting dolphins at Entergy's fuel unloading facility.

Under maritime law, there is a presumption of fault on the moving vessel when it allides with

a stationary object such as the Dolphin Fender System at the fuel unloading facility. In response to this presumption of fault, Defendants, Marquette Transportation Company, LLC ("Marquette") and Bluegrass Marine. LLC ("Bluegrass")(collectively hereinafter referred to as Defendants), which owned and operated M/V Robert E. Frane, are seeking to avoid and/or limit liability by alleging that the Dolphin Fender System was an obstruction to navigation and was in violation of the Rivers and Harbors Act. Defendants cannot produce any evidence to support this conclusory allegation. Even if true, Defendants had a duty to avoid the allision. Defendants cannot rebut the presumption that they are at fault and, as a matter of law, partial summary judgment must be granted on the issue of liability.

## II.  Factual History

Entergy owns the Baxter Wilson Power Plant in Vicksburg, Mississippi, which borders the Mississippi River. At the plant, Entergy has a fuel unloading facility with a dock and floating pier that extends into the Mississippi River. Just north of the Baxter Wilson Plant, the Interstate 20 Bridge and the Railroad Bridge cross over the Mississippi River. On the morning of April 5, 2008, M/V Robert E. Frane, along with a tow of twenty five barges, waited on the eastern bank of the Mississippi River just north of Vicksburg for river traffic (four other boats) to clear the two bridges before it attempted to pass through the bridges while heading south on the Mississippi River.

When M/V Robert E. Frane came around the bend in the river to set its navigational course through the two bridges, the Captain realized the river currents were stronger than he anticipated. While attempting to transit through the channel span of the Vicksburg Railroad Bridge, one of the barges in tow (port stern barge) allided with the easternmost pier of the bridge and came loose from the tow of twenty five barges. M/V Robert E. Frane immediately began attempting to slow the vessel

and tow while seeking assistance from other tug boats on the river. M/V Robert E. Frane continued it course down the river and safely made it through the Interstate 20 Bridge. However, despite the fact that efforts were being made to get the vessel and tow under control, the port lead barge allided with Entergy's dock and fuel unloading facility at the Baxter Wilson Plant. This allision caused damage to the Dolphin Fender System, which is used to protect the mooring/breasting dolphins at Entergy's fuel unloading facility.

Entergy then secured construction bids to repair the damaged Dolphin Fender System. Riverside Construction ("Riverside") was selected to complete the necessary repair work. Riverside's initial estimate was for $176,585.52, but has a current bid of $210,575.00, which is an update reflecting current material/labor costs and pricing. The repairs to the Dolphin Fender System simply return it to the same condition and functionality it enjoyed prior to the incident and will not extend its useful working life.

### III.  Standard of Review

Summary judgment may be granted upon a showing that "[t]here is no genuine issue as to any material fact and … the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(c). The movant "bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. … The non-moving party must then … designate specific facts showing that there is a genuine issue for trial." *First Colony Life Ins. Co. v. Sanford*, 480 F. Supp. 2d 870, 874 (S.D. Miss. 2007)(citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)) (internal quotation marks omitted). "The principal function of the motion for summary judgment is to show that, in the absence of factual disputes, one or more of the essential elements of a claim … is not in

3

doubt and that, as a result, judgment should be entered on the basis of purely legal considerations." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986). "[C]ourts should not hesitate to grant summary judgment where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *OMP v. Security Pac. Business Fin., Inc.*, 716 F.Supp. 239, 244 (N.D. Miss. 1989) (internal quotation marks omitted).

## IV.  Argument

### A.   M/V Robert E. Frane Allided with Entergy's Stationary Dolphin Fender System and Defendants Are Presumed to Be at Fault

Under maritime law, when a moving ship allides with a stationary object, there is a rebuttable presumption of fault. *The Oregon*, 158 U.S. 186, 192-93, 15 S. Ct. 804, 807 (1895); *see also Pennzoil Producing Co. v. Offshore Express, Inc.* 943 F.2d 1465, 1471 (5th Cir. 1991); *American Petrofina Pipeline Co. v. M/V Shoko Maru*, 837 F.2d 1324, 1326 (5th Cir. 1988); *Delta Transload, Inc. v. M/V Navios Commander*, 818 F.2d 445, 449 (5th Cir. 1987); *United States v. T/B Arcadian*, 714 F.2d 470, 474 (5th Cir. 1983). "This presumption shifts the burden of proof -- both the burden of producing evidence and the burden of persuasion -- onto the moving ship." *American Petrofina*, 837 F.2d at 1326 (citing *Delta Transload*, 818 F.2d at 449).

In order for the moving ship to rebut the presumption of fault, it must show, by a preponderance of the evidence, that the collision was the fault of the stationary object, that the moving ship acted with reasonable care, or that the collision was an unavoidable accident. *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977). Defendants cannot prove by a preponderance of the evidence that Entergy was at fault, that the ship acted with reasonable care or that the accident was unavoidable. Indeed, Defendants admit that the only defense they have towards

4

liability in this case is their claim that the Dolphin Fender System was an unpermitted obstruction in the Mississippi River. David Griggs, Defendants' 30(b)(6) representative, stated that:

> Q: And, really, the mitigation, betterment and depreciation, all three of those categories or issues, if you will, really deal with the limitation or reduction of the damages in this case and not really the liability of this case; is that correct?
>
> A: Offset the monetary values to limit the exposure, yes.
>
> \* \* \*
>
> Q: We've talked about these four issues, mitigation, permit, betterment and depreciation. My next question to you is this, very simply: Is there anything other than these four areas or issues that would avoid liability of the incident?
>
> A: To my knowledge, no.
>
> \* \* \*
>
> Q: Is there anyone on behalf of the company going to provide testimony at a trial in this matter that Marquette or Bluegrass is not responsible for this incident but for the permit issue?
>
> A: To my knowledge, I don't – I do not believe so.

*See* Deposition of David Griggs, pgs. 37-38, 40-41, 42 (objections to form omitted), which is attached hereto as Exhibit A. Even more problematic for Defendants, their 30(b)(6) representative also admitted that Defendants should not have hit the Dolphin Fender System:

> Q: Okay. So, going back to my question, assuming that [the Dolphin

5

> Fender System] was properly permitted and if it's later deemed by this court to be a properly permitted structure, they shouldn't have hit it, correct?
>
> A: We shouldn't have hit it, anyway, but we -- ***I'm kind of blocked in here, in one respect.  We shouldn't have hit it, period.***

*Id*. at 39-40 (emphasis added).

Despite this admission and even though a presumption of fault exists under the *Oregon* Rule, Entergy can prove through undisputed testimony that Defendants negligently navigated down the river and caused damage to the Dolphin Fender System.  The allision was the result of Defendants miscalculation in the river currents.  As Capt. Larry Gwin testified, he failed to properly transit the channel span under the Vicksburg Railroad Bridge because he didn't properly anticipate the currents:

> Q: And then what was your plan to go through the – the channel span?  Was it to go forward pushing the barges in front of you?
>
> A: Yes, sir.
>
> Q: All right.  And how where you going to attempt to do that?
>
> A: You have to hold to the center of the river, but you have to come kind of hold – once you get to the bend in the river, every pilot I know including myself, we've had to contend – and try to contend with currents, and we hold high.
>
> \*   \*   \*
>
> Q: So you initially slowed down, and then you started to speed back up?

A: Yes, sir.

Q: And that was before you ever got to the bridge?

A: That's – I slowed down until I got – made my turn, and you may explain to him, I'm pointing here, at this point right here what I'm lined up – where I'm looking, where I want an intended route, I came ahead on the engines.

Q: Okay. Right around the bend?

A: Right around the bend basically lining up with the bridge.

Q: All right. And – and under normal circumstances, that – that should have gotten you through the span?

A: Yes, sir.

Q: But it didn't?

A: No, sir.

Q: And in your opinion, why didn't that happen?

A: Sir, I – it – it had to be the conditions.

Q: And – and those were the conditions of the river?

A: Yes, sir.

\* \* \*

Q: Was the current stronger than you anticipated that day?

A: Yes, sir. I – I tried to allow for it.

*See* Deposition of Larry Gwin, p. 38-39, 43-44, 121, which is attached hereto as Exhibit B. Capt. Gwin admitted that he was the master of M/V Robert E. Frane and responsible for contending with

7

Case 3:13-cv-00879-HTW-LRA   Document 62   Filed 08/10/12   Page 8 of 16

the perils of navigation such as the water conditions the day of the incident:

> Q: Would you consider the – the situation that day with the river and the flow of the river to be a peril of navigation and something that as a captain you have to contend with?
>
> A: Yes, sir, I would.

*Id.* at 115. Defendants also admit that safe navigation through the river currents and conditions was a duty of Capt. Gwin:

> Q: You would agree with me, would you not, that a captain of a vessel is supposed to take into consideration when he's navigating down the river the currents in the river?
>
> A: He's constantly assessing those conditions, correct.
>
> Q: And that's a part of his job duties, in terms of keeping the vessel and any barges that might be in tow under control?
>
> A: Again, yes, he's constantly assessing the situation to maintain the safety and integrity of his tow.

*See* Exhibit A, p. 14-15.

In *Bunge Corp.*, the Fifth Circuit has held that in situations like this, the duty of care lay solely with Defendants because:

> The striking of a fixed object on the dock by a moving steamer constitutes damage not ordinarily done by a boat under control and carefully managed, and is prima facie evidence of negligence. Plaintiff was not bound to assume possible negligence on the part of the Bradley, nor was it bound to take any action with reference to a navigation operation which was wholly within defendant's control.

Bunge Corp., 558 F.2d at 798 (quoting *Ford Motor Co. v. Bradley Transportation Co.*, 174 F.2d 192, 196 (6th Cir. 1949)). Under maritime law, the master must be "in charge of the operation and navigation of the vessel at all times and it was his duty to exercise a high degree of care in accordance with the skill necessary in the control and management of a modern oceangoing tankship to avoid injury . . . ." *Bunge Corp.*, 558 F.2d at 799 (citing *Esso Standard Oil, S.A. v. The S.S. Sabrina*, 154 F. Supp. 720, 724 (D. Canal Zone 1957)). Defendants' miscalculation of the river current caused M/V Robert E. Frane to allide with the Vicksburg Railroad Bridge and Entergy's facilities.

### B. Defendants Cannot Avoid Liability under Their Affirmative Defenses That the Structure Was an Obstruction or Built in Violation of the Rivers and Harbors Act

Defendants assert two affirmative defenses in their Answer to Entergy's Amended Complaint that attempt to avoid and/or limit liability. *See* Defendants' Answer to Amended Complaint, which is attached hereto as Exhibit C. As explained by Defendants, these two affirmative defenses, although listed separately in Defendants' Answer, are only one defense to liability. *See* Exhibit A, pgs. 37-38, 40-41, 42. Defendants' Eighth Defense claims that the Dolphin Fender System was built in violation of the permit issued by the U.S. Army Corps of Engineers, which would be a violation of the Rivers and Harbors Act. Defendants' Tenth Defense claims that the Dolphin Fender System was an obstruction to navigation. Defendants cannot offer any proof other than conclusory allegations that Entergy failed to properly permit the dolphins and Dolphin Fender System at the fuel unloading facility in Vicksburg, Mississippi. Under Fifth Circuit law, even if Defendants could offer evidence to support this defense, Defendants cannot avoid liability from the alleged lack of a proper permit. Accordingly, Defendants' defense(s) to liability is without merit and summary judgment is appropriate as a matter of law.

9

### 1.  An Unpermitted Dolphin Fender System Does Not Limit Liability of Defendants

Defendants claim that Entergy obtained a permit ("the Permit") from the United States Army Corps of Engineers ("ACOE") on November 13, 1973, which did not authorize Entergy to construct the Dolphin Fender System along with the breasting, mooring and protective dolphins. The pertinent language contained in the Permit states that:

> [Y]ou are hereby authorized by the Secretary of the Army to construct a hydraulic land fill behind top bank and construct a fuel unloading facility. The land fill will consist of about 575,000 cubic yards of dredged material from the bed of the Mississippi River. The terminal will consist of floating platform, walkway, piping and pertinent auxiliary equipment in the Mississippi River.

*See* ACOE Permit, November 13, 1973, attached hereto as Exhibit D. Since the mid 1970s, the dolphins and Dolphin Fender System at the fuel unloading facility have been in the Mississippi River and used to protect and help load and unload fuel at the dock. Without the dolphins and Dolphin Fender System, Entergy would not be able to load or unload fuel at the facility. Defendants simply have no proof or evidence that the Dolphin Fender System was not permitted and cannot create a material issue of fact when no admissible facts supporting their defense(s) exist.

However, even assuming *arguendo* that Defendants are correct in their assertion and the Plaintiff is in violation of the Rivers and Harbors Act, 33 U.S.C. § 403,[1] by having an unpermitted fender system at the fuel unloading facility, Defendants' liability will not be limited from such violation. *See American River Trans Co. v. Kavo Kaliakra SS*, 148 F.3d 446 (5th Cir. 1998); *Dow*

---

[1] The Rivers and Harbors Act requires the U.S. Army Corps of Engineers to issue a permit for the construction of any "wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water." *See* Rivers and Harbors Act, 33 U.S.C. § 403.

*Chemical Co. v. Dixie Carriers, Inc.*, 463 F.2d 120 (5th Cir. 1972).

In *Dow Chemical*, Dixie Carriers' tug, with barges under tow, struck a fender system on a railroad bridge three separate times causing damage to the fender system. *Dow Chemical*, 463 F.2d at 121. Dixie Carriers challenged liability under the River and Harbors Act because Dow Chemical had failed to secure a permit from the Corps to construct the fender system. *Id.* at 122. The Fifth Circuit found that Dow Chemical's failure to secure approval from the Corps was a violation of the River and Harbors Act, but that the violation did not cause the allisions because there was not any evidence to suggest "that the fender system caused or contributed to the collisions simply by being there." *Id.* Consistent with the holding in *Dow Chemical*, when Capt. Gwin was asked about hitting the Dolphin Fender System he stated:

> Q: And had you not hit and initially allided with the Vicksburg
> Railroad Bridge, do you believe that you would have hit this dolphin?
> A: No, sir.

*See* Exhibit B, p. 110. Indeed, but for the errors in navigation, M/V Robert E. Frane should have passed far away from the fuel unloading facility:

> Q: And had you not hit the Vicksburg Railroad Bridge and you made
> it through the bridges, how far out, again, would you have passed
> from -- from that facility?
> A: I would say 400 to 500 foot, but with the current running that day,
> it's probably every bit of that.

*Id.* at 110-111.

Similarly, in *American River*, M/V Kavo Kaliakra, with barges in tow, allided with barges that

11

were tied to a dock at a fleeting facility on the Mississippi River. *American River*, 148 F.3d at 448. The fleeting facility was a permanent floating barge dock on the bank of the Mississippi River (properly permitted with the Corps) that was used to temporarily tie barges up while they were being cleaned and repaired. *Id.* While barges were tied to the dock, M/V Kavo Kaliakra was heading downriver and lost power and steering and then allided with barges tied to the fleeting facility. *Id.* The owners of M/V Kavo Kaliakra, (collectively referred to as "Arosita"), sought protection from liability because the barges, which were either being cleaned and/or repaired and were tied to American River's fleeting facility, were not properly permitted by the Corps and in violation of the Rivers and Harbors Act. *Id.*

The Fifth Circuit, following the same reasoning in *Dow Chemical*, found that the barges did not cause the allision because they were tied to the dock, but rather that M/V Kavo Kaliakra caused the allision by steering off course. *Id* at 450. Arosita even argued (based on evidence) that had the barges been arranged differently, the allision would not have occurred. *Id.* The *American River* Court dismissed this argument outright because it was nothing other than "a restatement of the position that the unpermitted barges caused the accident by 'being there.'" *Id.* at 450-451. The *American River* Court rejected the permit liability argument of Arosita, just as this Court should reject the argument of Defendants.

Just as the Fifth Circuit found in both *Dow Chemical* and *American River*, an unpermitted (although not established) presence of the Dolphin Fender System at the fuel unloading facility does not create liability by simply "being there." Defendants simply have no evidence or proof that the Dolphin Fender System was unpermitted or did anything to cause and/or contribute to the allision. As a matter of law, Defendants cannot avoid liability even if the Dolphin Fender System was not

properly permitted.

## 2. Defendants must Avoid Hitting Known Objects in the Mississippi River.

In *Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 503 (5th Cir. 1994), the appellant, whose barges collided with a pipeline, argued that the district court erred in its determination of liability by applying the presumption of fault against it since the pipeline was an obstruction to navigation. In support of this position, the appellant in *Brunet* claimed that the presumption of negligence created under the *Oregon* Rule disappears once evidence of the obstruction is presented. *Brunet*, 15 F.3d at 503.[2] The *Brunet* Court affirmed the district court's finding of negligence by stating that "[w]e rejected this disappearing presumption argument in [*Bunge Corp*], stating that the presumption of fault affects the burden of proof, not merely the burden of going forward with the evidence." *Id.* The Court in *Brunet* specifically held that when a mariner is aware of an obstruction and still hits it, the presumption of fault must be applied, because "when a mariner knows of obstructions to navigation, he must avoid them." *Brunet*, 15 F.3d at 503 (quoting *Pennzoil*, 943 F.2d at 1470).

As already discussed, Defendants admitted that it should not have hit the Dolphin Fender System. Further, Capt. Gwin knew exactly where Entergy's dock and fuel unloading facility was on the Mississippi River because he has been navigating up and down the Mississippi River for almost forty years:

> Q. How many times would you say you've passed this area of the
>
> river in the last 40 years, rough estimate?

---

[2] The appellant in *Brunet* relied on dicta in *S.C. Loveland, Inc. v. East West Towing, Inc.*, 608 F.2d 160, 165 n. 3 (5th Cir.1979)(citing *Pennsylvania R.R. v. S.S. Marie Leonhardt*, 320 F.2d 262, 264 (3rd Cir.1963)), for the argument that the presumption disappeared. *Brunet*, 15 F.3d at 503.

> A  Rough estimate?  God, that would be hard to say.  I would say 100-plus.
>
> Q:  You've never collided or allided within – in – at any other time, have you?
>
> A:  No, sir.
>
>                       \*   \*   \*
>
> Q:  Prior to this day, April 5, 2008, you had actual knowledge that these facilities of Entergy were there on that location on the river?
>
> A:  Yes, sir.
>
> Q:  And, in fact, if we look back at –
>
> A:  The chart.
>
> Q:  If we look back at Exhibit D, it's actually charted on there, correct?
>
> A:  Yes, sir.
>
> Q: Now, is this a – this chart which was provided to us by Marquette appears to be a chart from the U.S. Army Corps of Engineers?
>
> A: That's correct.  I don't know what edition it is.

*See* Exhibit B, p. 109, 112.

Under *Pennzoil* and its progeny, Defendants cannot avoid liability since they had actual and constructive knowledge that the fuel unloading facility, along with the mooring/breasting dolphins, protective dolphins and Dolphin Fender System, was in existence in the Mississippi River. Defendants had a duty to avoid the allision and the breach of this duty was the proximate cause of damages to

Entergy.

## V.  Conclusion

For the foregoing reasons, Entergy Mississippi, Inc. submits its *Motion Partial Summary Judgment* should be granted as a matter of law.  Entergy prays for such other and further relief, whether general or specific, to which it may be entitled in the premises.

Respectfully submitted, this the 10th day of August, 2012.

**ENTERGY MISSISSIPPI, INC.**


By: */s/ Sean R. Guy*

Sean R. Guy (MSB#100362)
*Its Attorney*

OF COUNSEL:

MCCRANEY MONTAGNET & QUIN, PLLC
602 Steed Road, Suite 200
Ridgeland, Mississippi 39157
Telephone:    (601) 707-5725
Facsimile:    (601) 510-2939

**CERTIFICATE OF SERVICE**

  I, Sean R. Guy, attorney for Entergy Mississippi, Inc., do hereby certify that I have this date delivered via ECF, a true and correct copy of the foregoing document to the following:

 Todd G. Crawford
 John A. Scialdone
 Christopher L. Schmidt
 John S. Garner
 Fowler, Rodriguez, Valdes-Fauli
 Post Office Box 4080
 Gulfport, Mississippi 39502

 *Attorneys for Marquette Transportation Company, LLC*
 *and Bluegrass Marine, LLC*


This the 10th day of August, 2012.

               /s/ *Sean R. Guy*

               Sean R. Guy